AES/DG
F. #2019R01319

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

GAUTAM CHOUDHARY,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANT
(18 U.S.C. § 1349)

22-M-449

EASTERN DISTRICT OF NEW YORK, SS:

        CHRISTOPHER YOUN, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

        Upon information and belief, in or about and between April 2017 and October 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant GAUTAM CHOUDHARY, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud, and to obtain money and property by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

        (Title 18, United States Code, Sections 1349 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1.      I have been employed as a Special Agent with the FBI for approximately four years. While working for the FBI, I have participated in numerous investigations of criminal activity, and I am assigned to a squad tasked with investigating white collar crime, including securities fraud, wire fraud, mail fraud and money laundering, among other offenses. During the course of these investigations, I have conducted or participated in surveillance, undercover operations, the execution of search warrants and arrest warrants, debriefings of informants, interviews of witnesses, victims, and subjects, and reviews of recorded conversations and financial records.

2.      I am familiar with the facts and circumstances set forth below from, among other things: (a) my personal participation in the investigation of this case, (b) discussions with other law enforcement agents involved in this investigation and (c) my review of emails, bank records and other sources of evidence.

3.      Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant GAUTAM CHOUDHARY, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein. In addition, where the contents of documents, or the actions, statements and

conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

I.  The Defendant and Relevant Entities

4. The "Company," an entity the identity of which is known to your deponent, was a Limited Liability Company ("LLC") that was headquartered in Florida and had offices in New York, New York. The Company, which registered as an LLC in Florida in or about August 2016, represented itself on its website and in marketing materials as a factoring company. Factoring involves the sale of an invoice to a third-party for a discount. In a factoring transaction, the seller of an invoice obtains immediate funding from a buyer, and the buyer of an invoice makes a profit when the invoice is paid in full. The Company purported to be in the business of buying invoices.

5. The defendant GAUTAM CHOUDHARY was a citizen of India and a resident of Florida. As described further below, CHOUDHARY opened bank accounts in the names of at least thirteen companies that received more than $30 million in wire transfers from the Company.

6. Pushpesh Kumar Baid, also known as "PK Jain," was a citizen of India and resident of Florida. Baid was the Business Head of the Company.

7. "Co-Conspirator 1," an individual whose identity is known to your deponent, was a citizen and resident of India. Co-Conspirator 1 was the Chief Operating Officer of the Company.

8. "Co-Conspirator 2," an individual whose identity is known to your deponent, was a citizen of India. Co-Conspirator 2 was a partial owner of the Company.

3

9. "Individual 1," an individual whose identity is known to your deponent, was a resident of Queens, New York. Individual 1 was the Managing Director of the Company.

10. "Individual 2," an individual whose identity is known to your deponent, was a resident of New Jersey. Individual 2 was listed as the authorized person to manage the Company in its August 2016 articles of organization and was identified as a Company representative in numerous Company documents, including contracts that were signed in Individual 2's name on behalf of the Company. Individual 2 was an employee at an international bank and a friend of Baid.

11. The "Investment Firm," an entity the identity of which is known to your deponent, was a Delaware LLC controlled by two brothers ("Principal 1" and "Principal 2" and, collectively, the "Principals"). The Principals worked with a financial executive ("Executive 1"), who helped run the Investment Firm. The Investment Firm made investments on behalf of approximately 50 investors.

12. "Affiliate 1," an entity the identity of which is known to your deponent, was an affiliate of the Investment Firm and controlled by the Principals.

13. "Bank 1," an entity the identity of which is known to your deponent, was a bank headquartered in New York.

14. "Bank 2," an entity the identity of which is known to your deponent, was a bank headquartered in Maryland.

II.      <u>The Fraudulent Scheme</u>

    A.      <u>Overview</u>

          15.      In or about and between April 2017 and October 2019, the defendant GAUTAM CHOUDHARY, together with others, conspired to defraud the Investment Firm, its investors and the Principals, by inducing the Investment Firm to invest in the Company through a series of material misrepresentations about, among other things, the individuals who purportedly operated the Company; the nature of the Company's business; the relationship between the Company and the entities with which it was purportedly factoring invoices; and the ways in which the Investment Firm's investments in the Company would be used.

          16.      In or about and between March 2018 and October 2019, the Investment Firm invested approximately $108 million in the Company for the purpose of factoring invoices. Almost all of the money that the Investment Firm invested in the Company was for the factoring of invoices from sixteen different sellers of various products, all but one of which were purportedly based in India.

          17.      For example, the Investment Firm invested more than $8 million for factoring invoices from a company called "Great Eastern Retail Private Limited" that purportedly was based in India and sold electronics, more than $8 million in factoring invoices from a company called "Eastman Exports Global Clothing Pvt Ltd" that purportedly was based in India and sold clothing, and more than $6 million in the Company for factoring invoices from a company called "Hello Trader" that purportedly was based in India and sold chemicals.

5

18.     For each investment, the Company provided the Investment Firm with copies of the invoices that purported to detail, among other things, the quantity and price of the products that were purportedly sold.

19.     In furtherance of the scheme, the defendant GAUTAM CHOUDHARY registered numerous companies in the United States, opened bank accounts in their names, and then used those bank accounts to receive millions of dollars that the Investment Firm had invested in the Company for the factoring of invoices.   Specifically, and as discussed further below, CHOUDHARY opened and/or was an authorized signatory on at least thirteen bank accounts opened in the names of entities that received millions of dollars from the Company.  The entities were LLCs registered in the United States by CHOUDHARY and others.   As shown in the table below, the names of the LLCs (the "CHOUDHARY LLCs") matched the names of the purported sellers whose invoices the Company claimed it was factoring:

| Sellers Whose Invoices The Company Claimed To Be Factoring | CHOUDHARY LLC |
|---|---|
| Balaji International Limited | Balaji Electo Group LLC |
| Best Corporation Pvt. Ltd | Best Clothing International LLC |
| Dynamic Trading | Dynamic Lifestyle LLC |
| Eastman Exports Global Clothing Pvt Ltd | Eastman Fashion LLC |
| Europan Enterprises International | Europan Enterprises International LLC |
| Great Eastern Retail Private Limited | Great Eastern Electronics LLC |
| Hello Trader | Hello Traders LLC |
| Khosla Electronics Private Limited | Khosla Multinational LLC |
| Mini International | Mini Fashion World LLC |
| New Wave Spices | New Wave General Traders LLC |
| Red Star Pharma | Red Star General Traders LLC |

| **Sellers Whose Invoices The Company Claimed To Be Factoring** | **CHOUDHARY LLC** |
|---|---|
| Spark Impex Trading | Spark General Trading LLC |
| Trueman Clothing Industries | Truman General Electric LLC |

20.     The defendant GAUTAM CHOUDHARY and others used bank accounts in the names of CHOUDHARY LLCs to, among other things, receive millions of dollars from the Company (money that had been invested in the Company by the Investment Firm for the purposes of factoring invoices from companies primarily based in India); transfer millions of dollars between different bank accounts in the names of different CHOUDHARY LLCs; withdraw hundreds of thousands of dollars in cash; transfer hundreds of thousands of dollars to an account for another entity associated with CHOUDHARY and other Company executives (the "CHOUDHARY Company"); transfer thousands of dollars to co-conspirators; and pay thousands of dollars in personal expenses.

21.     In or about July 2019, the Investment Firm stopped receiving payments on invoices it had factored through the Company.   At that time, the Investment Firm had approximately $31 million in unpaid invoices outstanding.   To date, the Investment Firm has not received payments on those invoices.   In or about April 2020, the Investment Firm filed for bankruptcy.

B.     The Company's Purported Factoring Business

22.     The Company represented itself as an international factoring company run by an executive team experienced in trade finance and specializing in factoring invoices of companies in particular industries and geographic regions.

23. In or about late 2017, the Principals of the Investment Firm began speaking with Individual 1 about a potential business relationship between the Investment Firm and the Company. Individual 1 was the Managing Director of the Company and had previously worked with the Principals on unrelated business projects.

24. On or about November 1, 2017, Individual 1 emailed the Principals and Executive 1 a document purporting to summarize the Company's business and describing the terms under which entities, such as the Investment Firm, could participate in factoring invoices through the Company (the "Participation Summary"). According to the Participation Summary, the Company would enter into a "Master Participation Agreement" with a participant authorizing the Company "to invest on [the participant's] behalf in credit insured, non-recourse factored invoices covering shipments from Indian based sellers to purchasers in Hong Kong, UAE and Singapore." The Participation Summary further stated that the Company would "compile a weekly listing of invoices for 'in transit' merchandise that will be eligible for factoring the subsequent week. Each participant will have the option to select a participation program by invoice or simply opt to invest a fixed percentage (10% to 90%) of the advanced amount in all invoices or a subset of invoices." The Participation Summary stated that "invoices are factored and advances of 80% of full merchandise invoice value are paid to seller only after documentary acceptance occurs at the purchaser's facility."

25. According to the Participation Summary, the Company "was started by a team of professionals with extensive knowledge and experience in international trade finance and [was] led by an experienced executive management team with successful track record of building a multi-million USD receivable finance business in emerging markets." The Participation

Summary further stated that the Company's "clients are small to medium sized export houses in India selling goods and services to 'credit insured corporates' in USA, UK, UAE, Hong Kong & Singapore" and that its corporate structure was "AML [Anti-Money Laundering] rule compliant."

26. In a section titled "Risk Management and Mitigation," the Participation Summary stated, among other things, that money would be advanced to sellers "only after irrevocable documented acceptance of goods by the purchaser is received by [the Company]."

27. With regard to the sellers whose invoices the Company factored, the Participation Summary stated they were reputed businesses in India. With regard to the buyers who purchased goods sold by the sellers, the Participation Summary stated that they were "all reputed parties located in legally strong jurisdictions like Dubai, Singapore and Hong Kong."

C. The Company's Factoring Relationship with The Investment Firm

28. In or about November 2017, Principal 1 had a phone conversation with Co-Conspirator 1 and Individual 1 to continue discussions about the Company's factoring business. During the call, Co-Conspirator 1 stated, in sum and substance, that the sellers whose invoices the Company factored were based in India and that the buyers who purchased goods sold by the sellers were mostly based in Hong Kong, Dubai and Singapore.

29. In or about and between November 2017 and February 2018, the Investment Firm and the Company continued negotiations and discussed entering into a Master Participation Agreement. During the negotiation period, representatives of the Company stated, in sum and substance and in part, that (i) the Company factored only invoices for which buyers received shipments for sellers; (ii) the sellers and buyers were independent from one another;

9

(iii) each seller had hundreds of buyers; (iv) each seller factored only a subset of its business; and (v) the prices on the sellers' invoices were wholesale. In addition, representatives of the Company provided representatives of the Investment Firm with, among other things, registers listing invoices it had factored and copies of its bank statements.

        30.    In or about February 2018, the Company and the Investment Firm entered into a Master Participation Agreement.[1] Under the terms of the Master Participation Agreement, the Company sent the Investment Firm participation schedules that included information for each invoice that the Company offered. The participation schedules included, among other things, the names of sellers and buyers, gross invoice amounts, insured amounts, amounts to be factored, the Investment Firm's proposed participation amount and the Investment Firm's profit share per invoice. During the course of the Company's relationship with the Investment Firm, the Company sent the Investment Firm participation schedules in advance of the Investment Firm's potential participation in the factoring of new invoices.[2]

        31.    At around the same time that the Company and the Investment Firm entered in the Master Participation Agreement, the Investment Firm facilitated the opening of a bank account in the Company's name at Bank 2. The Company's account at Bank 2 had a Deposit Account Control Agreement ("DACA") with an account at Bank 1 in the name of

---

[1] The Investment Firm entered into the Master Participation Agreement through Affiliate 1.

[2] The participation schedules were signed via DocuSign, a platform that allows users to, among other things, electronically sign and send agreements. Records produced by DocuSign included an account in the name of "[The Company] Docusign" that sent numerous Company documents via DocuSign in or about 2019. The address for the "[The Company] Docusign" account was the address for Individual 1 in Queens, New York.

Affiliate 1. Under the terms of the DACA, funds transferred into the Company's account at Bank 2 were automatically transferred into Affiliate 1's account. In connection with the execution of the DACA, Individual 1 told Principal 1 to send the agreement to Individual 1 at his address in Queens, New York.

32. In or about February 2018, the Investment Firm made its first investment of approximately $2 million for the factoring of invoices with the Company. The Investment Firm received its expected payments on the invoices and made profits on the investment. During the following year, the Investment Firm participated in the factoring of invoices with the Company and received payments on those invoices and made profits on its investments.

33. In or about March 2019, the defendant GAUTAM CHOUDHARY met with Principals 1 and 2, Co-Conspirator 1, Baid and others in Miami, Florida. The purpose of the meeting was to discuss a potential investment by the Investment Firm in the CHOUDHARY Company, which involved a number of the same individuals who worked at the Company and at times operated out of the same physical office as the Company. During the meeting, the Company's purported factoring business, as well as its relationship with the Investment Firm and the independence of the sellers for whom it factoring invoices, was discussed.

34. At no time during or after the March 2019 meeting did the defendant GAUTAM CHOUDHARY or his co-conspirators disclose to the Principals that CHOUDHARY had opened and/or was the authorized signatory on bank accounts for numerous entities that received more than $30 million from the Company—money that the Investment Firm had sent to the Company for the purpose of factoring invoices from sellers. Nor did they disclose how that money was being spent.

11

35. In or about April 2019, Co-Conspirator 1 told Executive 1 that approximately 29 payments on factored invoices had been delayed. Co-Conspirator 1 stated that a bank had randomly selected wires from buyers to the Company and requested additional information about them. Co-Conspirator 1 further stated that the wires had been returned to the buyers who had purportedly sent them.

36. In or about May 2019, a representative of Bank 2 contacted Principal 1 and asked him for information about an entity ("MSB 1"), the identity of which is known to your deponent, which had made wire payments into the Company's account at Bank 2. Principal 1 had not heard of MSB 1 and subsequently asked Co-Conspirator 1 what it was and why it (as opposed to the buyers) was paying the Company. Co-Conspirator 1 stated that MSB 1 was a money services business ("MSB") whose sole purpose was to convert local currency to United States dollars. Prior to this conversation, the Company and its representatives had not disclosed that MSBs were involved in the payment of factored invoices. On the contrary, the Company and its representatives had stated that payments to the Company (and then to the Investment Firm) were made directly by buyers.

37. In or about July 2019, the Investment Firm stopped receiving payments from the Company on invoices it had factored. At that time, the Investment Firm had approximately $31 million in unpaid invoices outstanding.

38. On or about October 7, 2019, Baid met with Co-Conspirator 1, Individual 1 and the Principals in New York. The meeting was consensually recorded. During the meeting, Co-Conspirator 1 stated, in sum and substance and in part, that: (i) sellers, buyers and MSBs all participated in an integrated payment cycle in which buyers paid MSBs, MSBs paid

the Company, the Company paid sellers and the sellers gave money to the MSBs to give back the buyers; (ii) MSBs were involved in a duty-drawback scheme in India, in which they profited through the refunding of duties paid on goods purportedly exported from India; (iii) MSB 1 was controlled by an individual who introduced the Company to the sellers whose invoices it purportedly factored; (iv) Co-Conspirator 1 did not know if the buyers were real companies; (v) the invoices that the Investment Firm factored were inflated; and (vi) shipments from sellers to buyers may not have contained actual products.

39. On or about and between October 8, 2019 and October 9, 2019, Baid met with Co-Conspirator 1, Individual 1, the Principals and Executive 1 in New York. The meeting was consensually recorded. During the meeting, Baid stated, in sum and substance and in part, that: (i) the Company paid the sellers, the sellers paid the MSBs, and the MSBs used the funds in part to execute their duty drawback scheme; (ii) MSBs were involved in the Company's business from the outset; (iii) MSBs invested some of the Investment Firm's funds in the Indian stock market; (iv) some of the Investment Firm's money was stuck in MSB bank accounts because of an investigation by the Indian government into the duty-drawback scheme; (v) the factored invoices were fabricated; (vi) the buyers did not make payments; and (vii) Individual 2, who previously had been listed as the Company's President and Chief Executive Officer, was involved in forming the Company but had no role in the Company after that.

D. The Defendant's Affiliation with the Purported Sellers and MSBs

40. As stated above, the defendant GAUTAM CHOUDHARY controlled numerous bank accounts that were associated with the sellers whose invoices the Company was

13

purportedly factoring and that received millions of dollars that the Investment Firm sent to the Company for purposes of factoring.

41.  For example, on or about October 31, 2018, the defendant GAUTAM CHOUDHARY opened a bank account at Bank 1 in the name of Eastman Fashion LLC. CHOUDHARY was the only signatory on the account.  According to information provided to Bank 1 in connection with the opening of the account, Eastman Fashion was incorporated in Delaware on or about August 28, 2018.  CHOUDHARY, Co-Conspirator 2 (who was a partial owner of the Company) and an individual ("Individual 3"), whose identity is known to your deponent, were listed as the members of the LLC.

42.  In or about and between October 2018 and April 2019, the Eastman Fashion bank account received approximately $4.7 million in incoming transfers.  Nearly all of those transfers – approximately $4.6 million – were from the Company.  During the same time period, almost all of the $4.7 million was disbursed, including approximately $2.6 million to bank accounts in the names of entities matching other sellers based in India for whom the Company was purportedly factoring invoices.  The defendant GAUTAM CHOUDHARY opened and/or was a signatory on a number of those accounts.  For example, the Eastman Fashion account transferred approximately $5,400 to an account at Bank 1 in the name of Khosla Multinational LLC.  As noted above, the Company purportedly factored invoices for companies called "Eastman Exports Global Clothing Pvt Ltd" and "Khosla Electronics Private Limited." Those companies were purportedly independent and in different industries: Eastman purportedly sold clothing and Khosla purportedly sold electronics.

43. Between in or about October 2018 and April 2019, approximately $10,000 in cash was withdrawn from the Eastman Fashion bank account at Bank 1.

44. On or about January 24, 2019, the defendant GAUTAM CHOUDHARY opened a bank account at Bank 1 in the name of Great Eastern Electronics LLC. Again, CHOUDHARY was the only signatory on the account. According to information provided to Bank 1 in connection with the opening of the account, Great Eastern Electronics LLC was incorporated in Delaware on or about October 3, 2018.

45. In or about and between January 2019 and April 2019, the Great Eastern Electronics bank account received and disbursed approximately $12.2 million in incoming transfers. Approximately $1.7 million of those incoming transfers were from the Company and approximately $9.7 million was from other accounts in the name of the CHOUDHARY LLCs. Between in or about January 2019 and April 2019, approximately $164,000 in cash was withdrawn from the Great Eastern Electronics bank account. The account was closed in or about April 2019.

46. On or about January 31, 2019, the defendant GAUTAM CHOUDHARY and Individual 3 opened a bank account in the name of Hello Traders LLC at Bank 1. According to information provided to Bank 1 in connection with the opening of the account, Hello Traders was incorporated in Delaware on or about October 3, 2018 (the same day that Great Eastern Electronics LLC was incorporated). CHOUDHARY and Individual 3 were listed as the members of Hello Traders LLC.

47. In or about and between January 2019 and April 2019, the Hello Traders bank account received and disbursed approximately $2.7 million. Nearly all of the incoming

transfers (more than 99%) were from the Company.  During the same time period, the Hello Traders bank account transferred more than $1.2 million to the Great Eastern Electronic LLC account at Bank 1.  As noted above, the Company purportedly factored invoices for companies called "Hello Trader" and "Great Eastern Retail Private Limited."  Those companies were purportedly independent and in different industries: Hello Trader purportedly sold chemicals and Great Eastern purportedly sold electronics.

48. Between in or about January 2019 and April 2019, approximately $223,000 in cash was withdrawn from the Hello Traders LLC bank account.  At the end of April 2019, there was no money in the account.

49. In or about April 2019, a bank account was opened in the name of Europan Enterprises International LLC, another purported seller whose invoices the Company was factoring, at a bank headquartered in the state of Georgia ("Bank 3"), the identity of which is known to your deponent.  The defendant GAUTAM CHOUDHARY and Individual 3 were the signatories on that account.  In or about and between April 2019 and September 2019, the Europan bank account at Bank 3 received approximately $2.95 million from accounts in the name of the Company or its affiliates.  During that same time period, the Europan bank account transferred approximately $95,000 to an account in the name of Baid and made approximately $69,550 in cash withdrawals.

50. In or about September 2019, a bank account was opened at Bank 3 in the name of MSB 1.  As noted above, MSB 1 was an entity that had been transferring funds into the Company account at Bank 2.  The defendant GAUTAM CHOUDHARY was one of two signatories on the MSB 1 bank account at Bank 3.  The MSB 1 account was opened for

approximately two months. During that time, the account received and disbursed approximately $117,000. On or about September 30, 2019, the account transferred approximately $87,000 to an account associated with the Company. The memorandum associated with the transfer stated that the funds were for Affiliate 1. Other transfers out of the MSB 1 account included a $3,000 transfer to an account in CHOUDHARY's name; a $14,500 transfer to an account in Baid's name; and approximately $6,900 in cash withdrawals.

III.     Conclusion

      WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant GAUTAM CHOUDHARY so that he may be dealt with according to law.

      Because public filing of this document could result in a risk of flight by the defendant GAUTAM CHOUDHARY, as well as jeopardize the government's ongoing

investigation, your deponent respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

Dated: Brooklyn, New York
April 20, 2022

CHRISTOPHER YOUN
Special Agent, FBI

Sworn to before me by telephone this
20 day of April, 2022

*Lois Bloom*
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK